# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| DANNY GILL | § | |
| | § | |
| | § | CIVIL ACTION 6:17cv187 |
| vs. | § | |
| | § | |
| | § | |
| COMMISSIONER, SOCIAL | § | |
| SECURITY ADMINISTRATION | § | |

## MEMORANDUM OPINION AND ORDER

On March 27, 2017, Plaintiff initiated this lawsuit by filing a complaint seeking judicial review of the Commissioner's decision denying his application for Social Security benefits. The matter is assigned to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636. For the reasons below, the Commissioner's final decision is **AFFIRMED** and the above-styled lawsuit is **DISMISSED WITH PREJUDICE**.

## PROCEDURAL HISTORY

Plaintiff protectively filed a Title II application for disability insurance benefits on October 10, 2013, alleging a disability onset date of July 10, 2012. The application was denied on January 15, 2014, and again on reconsideration on March 18, 2014. Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). An ALJ conducted a video hearing on May 26, 2015, and issued an unfavorable decision on July 10, 2015, concluding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act ("the Act"). Plaintiff submitted a request for review of the ALJ's decision. The Appeals Council denied the request for review on January 26, 2017. As a result, the ALJ's decision became that of the Commissioner.

Plaintiff then filed this lawsuit on March 27, 2017, seeking judicial review of the Commissioner's decision.

**STANDARD**

Title II of the Act provides for federal disability insurance benefits. Judicial review of the denial of disability benefits under section 205(g) of the Act, 42 U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (*per curiam*). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988)); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Rather, conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d at 360 (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); *Anthony*, 954 F.2d at 295 (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)). A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 455–56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance—that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*,

271 Fed. Appx. 382, 383 (5th Cir. 2003) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1302 n. 4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). However, the Court must do more than "rubber stamp" the Administrative Law Judge's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner's] findings." *Cook*, 750 F.2d at 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A) and 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five–step sequential process. *Villa*, 895 F.2d 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id.*; see *Bowling*, 36 F.3d at 435 (citing *Harrell*, 862 F.2d at 475). Under the five–step sequential analysis, the Commissioner must determine at

3

Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non–severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing his past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)–(f). An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at Step Three, or an affirmative answer at Steps Four and Five, creates a presumption of disability. *Id*. To obtain Title II disability benefits, a plaintiff must show that he was disabled on or before the last day of his insured status. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982). The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that he cannot perform his past relevant work. *Anderson v. Sullivan*, 887 F.2d 630, 632–33 (5th Cir. 1989) (*per curiam*).

The procedure for evaluating a mental impairment is set forth in 20 CFR §§ 404.1520a and 416.920a (the "special technique" for assessing mental impairments, supplementing the five-step sequential analysis). First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work. 20 CFR §§ 404.1520a(b)(1), 416.920a(b)(1). Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily

4

living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation. 20 CFR §§ 404.1520a(c)(2–4), 416.920a(c)(2–4). Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment. 20 CFR §§ 404.1520a(d), 416.920a(d). If the ALJ's assessment is "none" or "mild" in the first three areas of function, and is "none" in the fourth area of function, the claimant's mental impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 CFR §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing. 20 CFR §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the claimant's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described in [§§ 404.1520a(c)(3), 416.920a(c)(3)]." 20 CFR §§ 404.1520a(d)(3) and (e)(2), 416.920a(d)(3) and (e)(2).

## ALJ'S FINDINGS

The ALJ made the following findings in his July 10, 2015 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since July 10, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following "severe" impairments: arthritis, history of hernia repair and knee replacement, history of prostate cancer, obesity, and depression (20 CFR 404.1520(c)).

4. I agree with the DDS consultants that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). The opinion of the Medical Expert that the claimant's fatigue

in combination with the depression might meet Listing 12.07 is not accepted for the reasons set forth in this decision.

5. After careful consideration of the entire record, I agree that the impairments reasonably result in a residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for four hours in an eight-hour workday; and sit for six hours in an eight-hour workday. Further, the claimant can never climb ladders, ropes, or scaffolds, and can only occasionally kneel, crouch, crawl, and climb ramps and stairs. Additionally, the claimant can attend and concentrate for up to two hours and should avoid fast-paced assembly line work.

6. The claimant is capable of performing past relevant work as a land leasing examiner. This work does not require the performance of work-related activities precluded by the claimant's assigned residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 10, 2012 through the date of this decision (20 CFR 404.1520(f)).

## ADMINISTRATIVE RECORD

*Administrative Hearing*

Plaintiff testified at his hearing before the ALJ on May 26, 2015. Plaintiff testified that he cannot perform even a desk job because he cannot sit very long due to pain from scar tissue following his incisional hernia repair and pain in his knees. He stopped working in 2012 when he suffered one medical condition after another. Plaintiff stated that he had a radical prostatectomy following a prostate cancer diagnosis and surgery to repair an umbilical hernia with complications. Plaintiff later had an incisional hernia with mesh. He also stated that he had knee replacement surgery on his left knee, which required two additional surgeries including another replacement surgery.

Plaintiff estimated that he would need to lie down for two to three hours during an eight-hour workday. He testified that he has been depressed for some time and had problems when he was previously working. Plaintiff stated that he had difficulty concentrating, which affected his work output. He has tried antidepressants but he stopped taking them because they did not seem to help. He also has chronic fatigue that affects his ability to work for eight hours. With regard to

his prior work, Plaintiff testified that his work as a landman required him to go to various courthouses and to find landowners. It was not a sit-down job.

A medical expert witness, Dr. Jack Bentham, testified at Plaintiff's hearing. Dr. Bentham testified that the only psychological examination the record is Plaintiff's consultative examination in 2013. There are no records for psychological or psychiatric treatment. The consultative examiner diagnosed depressive disorder, moderate. Dr. Bentham opined that it would not meet a listing and he agreed with the DDS consultant's conclusion that Plaintiff has no mental limitations. Dr. Bentham noted that the medical records do not document chronic fatigue. He opined that, if severe, chronic fatigue combined with a depressive syndrome could impact the ability to work a forty-hour week. Dr. Bentham explained that treatment may improve Plaintiff's depression and fatigue, but there are no records showing treatment.

A vocational expert witness, LaKedra L. Parker, also testified at Plaintiff's hearing. Ms. Parker testified that Plaintiff's past job as a landman is classified as a land lease information clerk or land leasing examiner, DOT 237.367-026. It is sedentary, skilled work in an office as described by the Dictionary of Occupational Titles, but not as previously performed by Plaintiff. As previously performed by Plaintiff, it is light work. If Plaintiff can perform sedentary work—that is, lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking for four hours in an eight-hour day, and sitting for six hours in an eight-hour day, with occasional ramps and stairs, no ladders, ropes or scaffolds, and occasional kneeling, crouching and crawling—Ms. Parker testified that he can perform his past work as a landman. Ms. Parker stated that an individual performing work as a landman can expect to have a fifteen minute break every two hours and a lunch break and would be capable of performing the work if he can attend and concentrate for two-hour intervals.

7

*Medical Record*

Plaintiff started seeing Dr. Nghia Truong on December 14, 2011. Plaintiff presented with alcohol abuse and hypertension. Plaintiff reported drinking wine and vodka. He was encouraged to stop drinking and to go to the Behavioral Health Center for detox when he is ready. Dr. Truong noted that Plaintiff had an ongoing umbilical hernia. Plaintiff was negative for joint deformities or abnormalities and he had a normal range of motion for his age. He did not exhibit unusual anxiety or evidence of depression.

In 2012, Plaintiff was referred to Dr. Scott Martz for an elevated PSA. At an examination on March 26, 2012, Plaintiff had a prostate nodular on left base and on right apex. Dr. Martz performed a needle biopsy on March 28, 2012 which showed right prostate cancer and four out of six positive cores, as well as left prostate cancer and two out of six positive cores. At a follow up on April 3, 2012, Plaintiff denied having fatigue, fever, night sweats, abdominal pain, constipation, diarrhea, vomiting, cough, dyspnea or headache. Dr. Martz discussed treatment options on April 10, 2012 and Plaintiff requested a second opinion. Dr. Martz additionally recommended that Plaintiff consider repair of an umbilical hernia if he elects to have prostate surgery. Plaintiff returned on July 9, 2012 after obtaining a second opinion and notified Dr. Martz that he wanted to proceed with surgery. Dr. Martz performed a radical retropubic prostatectomy and umbilical hernia repair on July 18, 2012.

At a follow up on July 25, 2012, Dr. Martz noted that Plaintiff was doing well but continued to smoke. He recommended that Plaintiff stop smoking and advised him that continuing to smoke would jeopardize healing and possibly continence. Plaintiff returned on August 3, 2012. Dr. Martz again noted that Plaintiff was doing well but continued to smoke. Plaintiff had good control of urine but he had a seroma causing the superior aspect of the wound to be open. He was referred

for wound care. Plaintiff was discharged from wound care treatment on October 29, 2012 when the ulcer completely re-epithelialized.

Plaintiff saw his primary care physician, Dr. Truong, on October 1, 2012. Dr. Truong noted that Plaintiff reported decreased alcohol consumption, fatigue and depression. Dr. Truong started Plaintiff on Cymbalta. Plaintiff's physical examination was normal, but Dr. Truong noted that Plaintiff was positive for anhedonia without anxiety, pressured speech or suicidal ideation. At a follow up on October 15, 2012, Plaintiff requested to change his medication from Cymbalta to Prozac. Two weeks later, Plaintiff reported doing better on Prozac. He had slight sleepiness but was overall stable. Dr. Truong later tapered Plaintiff off of Prozac and replaced it with Wellbutrin.

On October 19, 2012, Dr. Martz described Plaintiff's status as stable. He noted that Plaintiff smokes every day and drinks four vodka drinks every day. Dr. Martz recommended that Plaintiff proceed with radiation therapy. Following radiation therapy, Plaintiff complained of severe fatigue and joint pain. Dr. Martz advised Plaintiff to remain active, stop smoking and avoid alcohol. He also prescribed Wellbutrin on March 26, 2013.

Plaintiff had an office visit with Dr. Truong on April 5, 2013. He noted that Plaintiff reported fatigue and depression. Dr. Truong stated that Plaintiff appeared stable when seen in the clinic but that he could be better. He increased Plaintiff's Wellbutrin dosage.

Dr. David Young examined Plaintiff on April 4, 2013 for his longstanding ventral hernia. Plaintiff's abdomen was obese and soft with a well-healed midline incision. Dr. Young noted fullness in the lower right abdomen consistent with a reducible incisional hernia. He advised Plaintiff that he was at increased risk for recurrence of the hernia due to obesity and ongoing tobacco use. Plaintiff opted to proceed with repair of the incisional hernia with implantation of mesh. Dr. Young performed the surgery on May 6, 2013. An X-ray two days after surgery showed a diffuse adynamic ileus that was treated with a nasogastric tube. Plaintiff was discharged on May

9

12, 2013. At follow ups on May 21, 2013 and May 30, 2013, Plaintiff had no complaints. He was eating well and his bowels were functioning properly. At his final follow up with Dr. Young on July 11, 2013, Plaintiff reported an occasional tinge in his right anterolateral abdominal wall, but he had no other complaints.

Plaintiff was referred to Dr. Jan Garrett for left knee pain. At an initial visit on September 9, 2013, Dr. Garrett noted that Plaintiff reported a long history of knee problems, worse on the left, but he had not had any treatment. Plaintiff stated that he had abdominal pain, neck pain and joint pain, but he denied feeling severely depressed. Plaintiff walked with a slow, measured gait and complained of knee pain while arising from and sitting down into a chair. Plaintiff's left knee had some tenderness over the medial joint line. Plaintiff's pulses and neurological function in the left foot were normal. Weight bearing X-rays of the left knee showed significant narrowing of the medial joint compartment. The right knee also showed narrowing but not as bad as the left. Plaintiff had arthritic change in the left patellofemoral joint but his right patellofemoral joint showed normal findings. Dr. Garrett recommended starting treatment with oral medication or injections. Plaintiff returned on October 14, 2013 following a cortisone injection and reported no improvement. Dr. Garrett recommended total joint replacement.

Plaintiff returned to Dr. Martz on September 23, 2013. Dr. Martz noted that Plaintiff was stable and denied fatigue and incontinence, but reported continued erectile dysfunction, abdominal pain and joint pain. He was given prescriptions for Cialis and hydrocodone.

On a Treating Physician Mental Functional Assessment Questionnaire, dated October 31, 2013, Dr. Truong stated that he had been treating Plaintiff for a mental condition but that he did not recommend treatment for a mental condition. He further stated that he did not know Plaintiff's mental diagnosis or current functional limitations.

Dr. Garrett performed Plaintiff's left total knee replacement on November 8, 2013. He was discharged on November 11, 2013 in stable and improved condition. On November 25, 2013, Dr. Garrett noted that Plaintiff was doing great and still in a lot of pain, but trying to reduce his pain medication.

Plaintiff had a consultative psychological examination on December 30, 2013 by Laci Morgan, Psy.D. Plaintiff reported feeling "blah" most days, poor motivation, extreme fatigue, feelings of hopelessness and worthlessness, poor sleep, increased appetite and anhedonia. He denied anxiety or worry. Plaintiff stated that he had not had any counseling or hospitalizations related to his mental health. Plaintiff presented with adequate hygiene and he was dressed appropriately. He had an erect posture but his motor activity appeared slowed. Speech and language skills were normal. Plaintiff was responsive and cooperative, but appeared sad. Thought processes and content were normal. His affect was sad and his mood was depressed. He did not demonstrate anxiety. Dr. Morgan noted that Plaintiff did not appear confused and he was oriented to person, place, time, situation and object. He exhibited average intelligence and an average fund of knowledge. Plaintiff reported being able to perform personal hygiene and household chores. He has several friends and does not have any problems with communication skills or getting along with people. Plaintiff stated that he takes longer to complete tasks due to poor motivation and difficulty focusing on tasks. He also stated that he copes with stress by sleeping. Plaintiff demonstrated adequate remote memory and fair immediate and recent memory, as well as normal concentration. His judgment was fair and his insight appeared intact.

Dr. Morgan diagnosed Major Depressive Disorder, Moderate. She assessed a fair prognosis in Plaintiff's ability to reason and to make occupational, personal and social adjustments. Dr. Morgan noted that Plaintiff's functional level would likely remain the same without treatment and that Plaintiff would struggle to deal with normal pressures in a competitive work setting due

to chronic fatigue and depressive symptoms. She opined that Plaintiff is not capable of managing benefits in his own interest.

Plaintiff continued to have numbness and pain in the left knee. On July 22, 2014, Dr. Garrett performed a revision of the left patellar component of the left total knee replacement. Plaintiff had a follow up on August 7, 2014. He arose from a chair with no complaints and walked around the room with a minimal limp. At an examination on September 17, 2014, Dr. Garrett noted that Plaintiff was walking satisfactorily but was still having an aching pain in the front of the left knee. Plaintiff also had degenerative arthritis of the right knee and Dr. Garrett injected the right knee.

Subsequently, Dr. Volatile examined Plaintiff. On examination, the left knee had audible, visible and palpable clunk on flexion and extension. He had full extension with 120 degrees of flexion. The knee was stable on extension, but grossly unstable to anterior/posterior drawer and flexion. Dr. Volatile noted that X-rays showed a posterior stabilized knee and overall good alignment. Dr. Volatile explained that Plaintiff had a flexion/extension gap mis-match that could only be treated with another revision. He performed the surgery on January 19, 2015. Post-operative X-rays of the left knee showed the left knee revision and antibiotic bead placement. An X-ray of Plaintiff's right knee on February 11, 2015 showed small joint effusion and moderate to severe degenerative osteoarthritis of the medial joint compartment.

Plaintiff was examined by Dr. Thomas Buzbee, an internal medicine physician, on December 24, 2014. In addition to his knee issues, Plaintiff reported sleeping two to three hours per day. No abnormalities were noted on Plaintiff's physical examination. Dr. Buzbee recommended an assessment for narcolepsy with a sleep medicine physician and assessed a Vitamin D deficiency. He referred Plaintiff to Dr. Volatile for treatment of his left knee. When

Plaintiff returned for a follow up on February 13, 2015, Dr. Buzbee noted that Plaintiff was scheduled for a sleep study. No abnormalities were noted on physical examination.

Plaintiff had a follow up with Dr. Martz on March 28, 2014. Dr. Martz noted that Plaintiff's condition was stable. Plaintiff denied symptoms such as urinary problems, fatigue or abdominal issues. When Plaintiff returned a year later, on March 30, 2015, Dr. Martz stated that Plaintiff's last PSA in October 2014 was undetectable.

A State agency medical consultant, Dr. Kavitha Reddy, reviewed the medical record on January 9, 2014. Dr. Reddy opined that Plaintiff retains the physical residual functional capacity occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday with unlimited push and pull except as shown for the lift and carry limitations. She also concluded that Plaintiff can occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and occasionally kneel, crouch and crawl. Another State agency medical consultant, Dr. Scott Spoor, reconsidered Dr. Reddy's opinion and determined that Plaintiff's physical residual functional capacity should be reduced to four hours of standing and walking.

## DISCUSSION AND ANALYSIS

In his brief, Plaintiff identifies one issue for review: whether the ALJ's finding that Plaintiff had the residual functional capacity to return to his prior employment was supported by substantial evidence. Plaintiff asserts that the ALJ improperly considered his past employment as a petroleum landman to fit within DOT 237.367-026. Plaintiff complains that his past work, as performed, did not fit into that category. Plaintiff additionally asserts that the ALJ's conclusion that he can walk or stand for six hours is not supported by substantial evidence because it is contrary to the State agency consultant's conclusion that he can only stand or walk for four hours.

After determining that Plaintiff has not engaged in substantial gainful activity since his alleged onset date, and that he has the severe impairments of arthritis, history of hernia repair and knee replacement, history of prostate cancer, obesity, and depression, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Plaintiff's brief does not challenge these findings.

Next, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for four hours in an eight-hour workday, and sit for six hours in an eight-hour workday, but he can never climb ladders, ropes, or scaffolds, and can only occasionally kneel, crouch, crawl, and climb ramps and stairs. The ALJ further determined that Plaintiff can attend and concentrate for up to two hours and should avoid fast-paced assembly line work.

In his brief, Plaintiff incorrectly alleges that, contrary to the finding of the State agency medical consultant, "[t]he ALJ found that Mr. Gill could walk or stand six hours in an eight-hour work day."[1] The ALJ's decision clearly states, however, his finding that Plaintiff can "stand and walk for four hours in an eight-hour workday."[2] The ALJ's RFC finding is consistent with the opinion of Dr. Spoor, which is the most limited RFC finding.[3] Plaintiff has not shown an error or that the RFC finding is not supported by substantial evidence.

Plaintiff also asserts that the ALJ's finding that he can perform his past work as a land leasing examiner is erroneous because he did not perform the work as described in the Dictionary of Occupational Titles. The vocational expert's testimony reveals that a DOT code was identified for Plaintiff's past relevant work based upon his written submissions to the Commissioner,

---

[1] *See* Opening Brief of Plaintiff, ECF 14, at *5.
[2] *See* Administrative Record, ECF 12-2, at *20 (Bates stamp p. 19).
[3] *Id.* at *21 (Bates stamp p. 22).

including his Work History Report.[4] The identified job most consistent with Plaintiff's description was that of a land leasing examiner, DOT 237.367-026, sedentary, skilled work. Plaintiff then testified at the hearing that his work, as actually performed, required light work activity instead of sedentary work activity.

"When determining whether or not a claimant retains the RFC to perform [his] past relevant work, the ALJ can look to either (1) the job duties peculiar to an individual job as the claimant actually performed it, or (2) the functional demands and job duties of the occupation as generally required by employees throughout the national economy." *Holland v. Colvin*, 2015 WL 5437727, at *11 (N.D.Tex. Aug. 31, 2015), *adopted in Holland v. Colvin*, 2015 WL 5439051 (N.D.Tex. Sept. 15, 2015), *aff'd Holland v. Colvin*, 652 Fed.Appx. 266 (5th Cir. 2016); SSR 82-61. An ALJ may properly consider whether a claimant can perform the work as it is generally performed in the national economy. *Id.*; *see also Leggett v. Chater,* 67 F.3d 558, 565 (5th Cir. 1995); *Semien v. Colvin*, 2013 WL 3778984 (W.D.LA July 17, 2013). Here, the ALJ expressly determined that Plaintiff can perform his past relevant work as a land leasing examiner, as that job is generally performed in the national economy at the sedentary work level.[5] His finding is consistent with the testimony of the vocational expert witness. Plaintiff's assertion of error lacks merit.

For the reasons above, the ALJ's findings are supported by substantial evidence. Plaintiff did not meet his burden of showing that he is disabled. *Ware v. Schweiker*, 651 F.2d 408, 411. The ALJ applied the correct legal standards. The Commissioner's decision should be affirmed and the complaint should be dismissed. It is therefore

---

[4] *See* Administrative Record, ECF 12-2, at *53 (Bates stamp p. 52).
[5] *Id*. at *27 (Bates stamp p. 28).

**ORDERED** that the Commissioner's final decision is **AFFIRMED** and that this social security action is **DISMISSED WITH PREJUDICE**.

So ORDERED and SIGNED this 13th day of March, 2019.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE